IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CARLOS FIGUEROA HIGAREDA,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Social
Security Commissioner;

Defendant.

**4:15CV3135**

**MEMORANDUM AND ORDER**

The plaintiff, Carlos Figueroa Higareda, appeals the denial of his application for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). Filing No. 3 (Complaint). On January 31, 2013, Higareda filed his initial application for disability benefits. The Commissioner of the Social Security Administration first denied Higareda's application on March 1, 2013, and again upon reconsideration on March 29, 2013. After a December 13, 2013 hearing before an Administrative Law Judge ("ALJ"), the ALJ issued an unfavorable decision on February 28, 2014 denying Higareda's claim. The Appeals Council for the Social Security Administration denied Higareda's request for review on September 21, 2015. Higareda then filed a complaint before this court. The court finds that the ALJ's determination was not supported by substantial evidence, and reverses the denial of Higareda's claim.

## I.   BACKGROUND

Higareda, born in September 1968, reports that he last worked on December 31, 2008. Filing No. 11-6 at 2, 7 (Disability Report). His highest level of education is the sixth grade in Mexico in 1979. *Id.* at 8; Filing No. 11-2 at 42 (Transcript of Oral Hearing). Higareda neither speaks nor is literate in English, but he speaks and can

read and write in Spanish.  Filing No. 11-6 at 6 (Disability Report); Filing No. 11-2 at 75-76 (Transcript of Oral Hearing).  He is married with three children--a son and daughter in their twenties, and a toddler.  Filing No. 11-7 at 21 (Office Treatment Records). Between May 1987 and June 2008, Higareda worked a series of physical labor jobs, including as a conveyor tender, construction worker, poured pipe maker, ribber, harvest worker, and agricultural produce packer.  Filing No. 11-2 at 63-64 (Transcript of Oral Hearing).

This appeal concerns Higareda's fifth application for Title II period of disability and disability benefits, and also for Title XVI supplemental social security income, and the third application for the same alleged period of disability.  Filing No. 11-2 at 17-18 (ALJ Decision).  All of his previous applications were denied.  *Id.*  Higareda alleges his ability to work is limited by his diagnosed bipolar disorder, psychosis, and epilepsy. Filing No. 11-6 at 7 (Disability Report).  He reports that, beginning January 29, 2011, these conditions have caused an inability to focus, forgetfulness, and a wandering mind. *Id.* at 2; *id.* at 16 (Function Report).  He states that he forgets to do certain things and has a hard time answering questions, which makes him frustrated, anxious, and "stressed out."  *Id.* at 32 (Disability Report).  This anxiety reportedly causes Higareda to need "an increase in medication in order to calm him down."  *Id.*  His medical records reveal that he has also experienced episodes of agitation, anger, paranoia, and depression.  *E.g.*, Filing No. 11-7 at 12, 15 (Office Treatment Records); *id.* at 41 (Progress Notes).  Higareda states that "when there's a lot of people around [him], it bothers [him] very much, and it stresses [him]."  Filing No. 11-2 at 42 (Transcript of Oral

Hearing).  He also states that children cause him stress and he gets angry "real fast." *Id.* at 43.

In disability reports completed for the purpose of obtaining disability benefits, Higareda stated he assists in church bible studies (though he does not participate because of difficulty focusing), and that around the home he sweeps, mops, takes trash out, mows the lawn, and gardens.  [Filing No. 11-6 at 13-14](Function Report).  He also watches his young child and grandchild for two hours at a time twice during the week, watches television for an hour at a time, *Id.* at 14.  Higareda's wife reports that Higareda does not talk much with other people and that he has difficulty maintaining focus.  *Id.* at 19-20 (Third Party Function Report).  She noted that she prepares his meals, helps him with grooming, and that she reminds him to take his medication.  *Id.* at 18-19.

### A.    Medical History

Dr. Eva Brion, M.D. at the Lanning Center for Behavioral Services had treated Higareda as his primary physician for eight years at the time of the ALJ hearing.  [Filing No. 11-7 at 5], 6, 19 (Office Treatment Records).  The majority of Higareda's medical history detailed below is taken from Brion's treatment notes.  According to the record, Higareda was hospitalized for manic behavior in February 2009, before the alleged onset date.  *Id.* at 5.   Higareda was "'violent', out of control . . . physically and verbally aggressive . . . threaten[ing] to hurt somebody. . . hallucinating and . . . delusional" during this particular episode.  *Id.*  He was discharged in March 2009 after "having achieved improvement."  *Id.*

On April 8, 2011, Higareda's wife reported that for about three days in March, Higareda was "agitated" and "not sleeping."  *Id.* at 8.  His wife said he "'acted weird,'"

3

was agitated, and was not sleeping.  *Id.*  Higareda's stress "over his wife baby-sitting two young children of their relatives at their house" triggered this episode.  *Id.*  His wife gave him an extra dose of Klonopin one night, which "helped him calm down."  *Id.* Brion noted that during the visit, Higareda would sometimes "laugh inappropriately and then calm down," and that his speech was tangential "a few times."  *Id.*  However, Higareda denied having auditory or visual hallucinations, or feeling depressed or homicidal.  *Id.* His thought process was "not disorganized," he appeared calm, cooperative, and alert, with fair concentration.  *Id.*  Brion opined that while Higareda "had an exacerbation of his bipolar signs and symptoms i.e. labile mood, mostly agitation and some depression," he was "able to function to some extent," and there was no need to alter his prescribed medications.  *Id.*

During a follow up visit on June 10, 2011, Higareda said that he was feeling "good," with no feelings of depression, anxiety, mood swings, or suicidal or homicidal ideations.  *Id.*  At 10.  Higareda's wife and son disclosed that Higareda "[was] slow in doing things at home," that his verbal responses were slow, and that "he does not know what to do in taking care of the baby."  *Id.*  Brion noted that Higareda "gets irritated when the baby cries" and then "stays in the bedroom."  *Id.*  Higareda reported having "weird dreams" but claimed to be sleeping well, and denied having any delusions or auditory or visual hallucinations.  *Id.*  Brion concluded that Higareda was "improving gradually" and advised him to keep taking his medications as prescribed.  *Id.*

Three months later, on September 14, 2011, Higareda's wife reported two episodes of decompensation.  *Id.* at 12.  The first was during a June trip to Disneyland, where Higareda "became very paranoid" because of the crowds.  *Id.*  In addition,

4

Higareda became delusional after helping to work on his brother's house for two hours a day. *Id.* In both cases, his wife gave him 80mg of Geodon twice a day for two days rather than the prescribed 160mg of Geodon at bedtime. *Id.* Higareda felt a little sedated after this, but better. *Id.* Higareda then resumed his regular dosage. *Id.*

Brion opined that Higareda "does decompensate when he is under a lot of stress." *Id.* At the September 14 appointment, Higareda again denied feeling depressed or suicidal, and stated he had no mood swings. *Id.* He admitted feeling anxious when he is stressed, but said he had been sleeping well and had a good appetite. *Id.* During the visit, he "appear[ed] verbal, calm, cooperative, and appropriate. . . alert, oriented to all spheres. . . [h]is mood [was] neutral with appropriate affect. . . his thought process [was] not disorganized and he [did] not exhibit florid delusions or auditory and visual hallucinations. . . [h]is concentration [was] fair." *Id.* Brion directed Higareda to stay on his medications as prescribed. *Id.*

On November 16, 2011, Higareda exhibited paranoia. His wife reported that Higareda had become "paranoid that 'people and our friends are talking about him.'" *Id.* at 15. He was apparently stressed by knowing he and his wife would have to visit the Mexican Embassy to obtain visas for a trip. *Id.* Higareda denied having auditory or visual hallucinations. *Id.* He said that "he [felt] calm. . . [and did] not feel depressed, suicidal, or homicidal." *Id.* He did not report any mood swings or anxiety. *Id.* He was sleeping well when taking his medication as directed. *Id.* He appeared neatly groomed, calm, cooperative, alert, and oriented to all spheres. *Id.* Brion did not alter his medication. *Id.*

5

During a February 8, 2012 visit, Higareda seemed "asymptomatic" and his "overall mental status [had] not changed compared to the last visit [on November 16, 2011]." *Id.* at 17. Higareda denied feeling paranoid, depressed, suicidal, or homicidal, and he did not experience any anxiety or mood swings. He also denied having any auditory and visual hallucinations. *Id.* His concentration was fair, and he appeared calm, cooperative, oriented, and neatly groomed. *Id.* However, his wife reported that every time Higareda goes on vacation with his family, "he gets excited and then later he becomes agitated for no reason; he comes down after I give him an extra dose of Geodon." *Id.* Brion concluded that Higareda cannot tolerate noise, "especially when the children make noise." *Id.* Because Higareda appeared to be asymptomatic on his current medication, he was directed to continue taking them as prescribed. *Id.*

On May 18, 2012, another provider at Lanning Center for Behavioral Services, Erica Ferrell, APRN, conducted a psychiatric evaluation of Higareda. Ferrell concluded that Higareda "remained relatively stable over the last few years" with his medication. *Id.* at 19. Higareda admitted to being "angrier than usual" and explained it was partially because he and his wife had "been unable to have sexual relations as much as they used to. [They] both agree that this is a great tension reliever for him." *Id.* at 20. He denied feeling depressed or irritated, and did not report any significant mood swings. *Id.* But his wife stated she thought he "gets a little paranoid at times," for example, thinking people at a party were talking about him when, in reality, they were not. *Id.* Higareda did not recognize this as a problem because his paranoia "[was] no worse than it has been over the last year or so." *Id.* Higareda denied auditory or visual hallucinations, delusions, or obsessions. *Id.* His hygiene was "good," and his "attention

6

span and concentration [were] adequate." *Id.* at 21. The evaluator recommended that Higareda continue on his current medication regimen. *Id.*

Four days later on May 22, 2012, Higareda's wife reported that Higareda had "been agitated and easy to anger." *Id.* at 25. They were scheduled to leave the next day for a seven week trip to Mexico, which caused Higareda to become more agitated and stressed. *Id.* In addition, they had recently hosted a party for their son's graduation, which made Higareda "anxious." *Id.* His wife reported that Higareda became verbally, but not physically, aggressive. *Id.* Higareda denied having mood swings, to which "his wife added, 'he just gets angry easily but he calms down.'" *Id.* Brion noted that Higareda responded to stress with agitation and began decompensating. She recommended increasing Tegretol and Klonopin and otherwise directed Higareda to continue taking Geodon and Celexa as previously prescribed. *Id.*

On July 23, 2012, after returning from Mexico, Higareda's wife reported that Higareda "did well" on the trip. *Id.* at 27. His wife stated that Higareda "kept himself busy" on the trip by "helping repair their house." *Id.* Higareda said he was not stressed or depressed, denied having homicidal or suicidal thinking, and also denied having anxiety or mood swings. *Id.* Brion concluded that Higareda was "improving" and "advised him to continue taking his medications since he seems to be responding well to the current medication regimen." *Id.*

Similarly, during an October 23, 2012 visit with Brion, Higareda was feeling good, functioning well, doing "the cooking, cleaning. . . [and] laundry" while his wife went back to work for six weeks. *Id.* Higareda was calm, cooperative, and alert. *Id.* His thought process seemed organized, his concentration was fair, and Brion noted "no psychosis,

nor looseness of association." *Id.* Brion further reported that Higareda continued "to improve and function better," and advised him to continue taking his current medications as prescribed. *Id.*

During a January 21, 2013 appointment with Brion, Higareda's wife reported that while in Mexico from November 2012 to January 2013, Higareda ceased taking his medication and became paranoid and violent. *Id.* at 33. He had "worked long hours" and "'tried to choke [his wife]'" after mistakenly believing she was cheating on him. *Id.* At the time of the appointment, Higareda did "not exhibit[] any signs and symptoms of decompensation. . . although he decompensates fast when he is not consistent with taking his medications and when he is under a lot of stress." *Id.* Brion did not make any medication changes because Higareda did not "seem to be decompensating," and was "already on good doses of all of his medications." *Id.*

On April 16, 2013, Higareda complained of stress, agitation, anger, mood swings, and an inability to concentrate. *Id.* at 48 (Progress Notes). He admitted to having "paranoid thoughts that his daughter [was] doing something bad." *Id.* The symptoms began when his wife started working two jobs, leaving him to take care of their two-and-a-half-year-old son and two-year-old grandson. *Id.* Higareda said "he was stressed out and he could not tolerate the noise created by the children." *Id.* His wife confirmed he was unable to function. *Id.* Higareda and his wife decided to place their son and grandson in daycare, which relieved Higareda's stress "somewhat." *Id.* Brion opined that Higareda had high anxiety and was "currently decompensating although . . . he started feeling better when relieved of the stress of taking care of his 2 ½ year old son and 2 year old grandson. Historically, [Higareda] does become paranoid and exhibits

8

bipolar signs and symptoms when he is under a lot of stress." *Id.*  However, because Higareda "start[ed] to improve and 'calm down'" since deciding to place the children in daycare, Brion did not revise his medication prescriptions.  *Id.*

During a June 3, 2013 appointment, Higareda's wife reported that his anxiety level "was down" after "he responded . . . quite well" to being prescribed Ativan.  *Id.* at 44.  But when his two-and-a-half-year-old son and grandson would cry, he would "get agitated" because he could not "tolerate their crying."  *Id.* Higareda was also experiencing paranoid thoughts that his married daughter and nineteen-year-old son were having sex, but denied auditory or visual hallucinations.  *Id.*  His mood was "somewhat depressed with congruent affect," but he had "fair" concentration.  *Id.*  Brion noted that he "[was] starting to decompensate," and prescribed Latuda "because of his increasing paranoia."  *Id.*

On June 25, 2013, Higareda reported trouble sleeping, which caused him to "'get angry easily.'"  *Id.* at 41.  He was feeling depressed, but denied suicidal or homicidal thinking.  *Id.*  Higareda still experienced paranoid thoughts, and reported a low tolerance to noise, staying in the bedroom and closing the door "because he cannot tolerate the noise of the children."  *Id.* He had not "exhibited any threatening or aggressive behaviors" or any mood swings, and denied having auditory or visual hallucinations.  *Id.* Brion concluded Higareda "[had] achieved minimal progress and [had] pretty much remained the same in his mental status."  *Id.*  Brion increased his Latuda dosage because of his continuing paranoia, and also increased his Klonopin dosage to help with his trouble sleeping.  *Id.*

On September 26, 2013, Higareda's last appointment with Brion in the medical record, Higareda reported feeling "easy to anger, [and] agitated almost daily, especially when he babysits his two-year-old son." *Id.* at 80 (Progress Notes).  Higareda also reported getting irritated when the house phone would ring and feeling depressed because of his "financial and economic problems."  *Id.*  He noted that while his anxiety was on and off, it had "not been that bad lately."  *Id.*  He did not complain of any mood swings, paranoia, or auditory or visual hallucinations.  *Id.*  Brion noted "[t]here [was] no psychosis or looseness of association elicited," and that Higareda had an organized thought process and fair concentration.  *Id.*  Brion opined that Higareda had "achieved some progress in his mental status in that he is no longer floridly paranoid, although his agitation continues and this is in response to babysitting his two-year-old son."  *Id.* Because of his slight improvement in mental status, Brion did not recommend any medication changes.  *Id.*

### B.    Medical Opinions

One of Brion's early records notes that based upon past work history, Higareda "probably could not work because he responds to even minor stressors with decompensation."  Filing No. 11-7 at 8 (Office Treatment Records).  Although Higareda did appear to improve after each episode, *id.* at 15, 27, 30; *id.* at 41, 80 (Progress Notes), Brion noted several episodes of decompensation due to stress throughout the medical records, *id.* at 25, 33 (Office Treatment Records); *id.* at 44, 48 (Progress Notes).   In April 2013, Brion opined that Higareda was indefinitely incapable of participating in: classroom learning; driving to training opportunities or to contacts with potential employers; and internships, skills training, or community volunteer work that

includes being seated and carrying out office work or working at a computer.  *Id.* at 36 (Short Term Exemption Statement).

In December 2013, Brion prepared a statement of mental impairments for Higareda, stating that Higareda's condition precluded him performing the following for 15% or more of an 8 hour workday: maintain sufficient attention and concentration to appropriately complete tasks in a timely manner, perform at a consistent pace without an unreasonable number and length of periods of rest, meet minimum quality and accuracy standards, complete a normal workday without interruptions from psychologically based symptoms, work in coordination with or proximity to others without being unduly distracted, get along with others without unduly distracting them or exhibiting behavioral extremes, deal with normal work stress, understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods and complete tasks independently, effectively, and in a timely manner, deal with stress of semiskilled and skilled work, and adjust to the demands of a new job or a different work setting from past experience.  *Id.* at 83-84 (Misc. Medical Records). Brion opined that Higareda would suffer additional limitations in unskilled, semi-skilled, or skilled work and in his ability to adapt to new work for 5% or 15% of an 8 hour workday. *Id.*  However, the ALJ gave this statement no weight because the form on which it was completed is not accepted by the Social Security Administration.  Filing No. 11-2 at 29 (ALJ Hearing Decision).

A State agency psychologist, Linda Schmechel, Ph.D., assessed Higareda using a medically determinable impairments and severity form on February 27, 2013.  *Id.* at 27; Filing No. 11-3 at 5-6 (Disability Determination).  Schmechel opined that Higareda

11

did not meet the (A), (B), or (C) criteria for the presumptive disability listing ("Listing") for mood disorder impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 at 12.04. *Id.* at 6. Another psychologist, Patricia Newman, Ph.D., came to the same conclusion on March 28, 2013. *Id.* at 28-29.

At the hearing, the ALJ called Dr. England to testify as an impartial medical expert. Filing No. 11-2 at 45-47, 54-62 (Transcript of Oral Hearing). After reviewing Higareda's disability reports and medical records, England acknowledged that, according to Brion's notes, Higareda does experience deterioration because of "relatively minor levels of stress." *Id.* at 57. However, England raised some concern over "conflict[s]" in the medical records. *Id.* at 56. England noted that Brion's assessments are not consistent with the global assessment of function ("GAF") ratings which she gave Higareda. *Id.* The GAF ratings, England testified, only indicated "moderate to mild levels of impairment." *Id.* England concluded,

> There is a possibility . . . [Brion] simply is overly according an overly high GAF or relatively impaired levels of function. The best I think I can do in trying to resolve the apparent conflict is to say it would appear that when claimant is stable on medication, he seems to do reasonably well, and would likely be capable of at least low stress, quiet environment, limited coworker and supervisor contact and general public contact, but there would be some risk of . . . stresses . . . perhaps precipitating lower levels of function, suggesting it may be difficult to maintain work activity in most work environments.
> But I don't think that I would say he could--I could say he would characteristically be as impaired as . . . [Brion] suggests in her rating. He may be impaired to those levels episodically, erratically.

*Id.* at 57.

England further testified that Higareda may meet the Listing for mood disorder at 12.04(C) because "it wouldn't take much of a stressful work situation likely to precipitate" limited work activity.  *Id.*  Additionally, as relevant to Listing 12.04(B), England noted that Higareda likely experiences mild to moderate difficulties with activities of daily living, moderate and sometimes marked difficulty with social functioning, and occasional periods of problems with concentration, persistence and pace.

Stella Doering, M.A., C.R.C, C.D.M.S., C.C.M, also testified at the hearing as a vocational expert.  *Id.* at 62-67; Filing No. 11-4 at 75 (Resume of Vocational Expert). Doering concluded that a person of Higareda's age, education, experience, literacy, who is limited to occasional interaction with coworkers or supervisors could not perform Higareda's past work.  Filing No. 11-2 at 64-65 (Transcript of Oral Hearing).  However, in response to the ALJ's hypothetical, Doering testified a person with that background could perform other jobs not involving interactions with the public such as industrial cleaner, lab equipment cleaner, and housekeeper, and others.  *Id.* at 65.  The work Doering identified apparently exists in significant numbers nationally.  *Id.* at 65-66.  But Doering further testified at the hearing that a person would not be able to maintain competitive work if he or she could not handle change, would become angry with supervisors daily, would have difficulty with coworkers, and who has trouble concentrating.  *Id.* at 67-68.

At the hearing, Higareda testified that he believes work would be stressful to him. *Id.* at 43.  He stated that he "feel[s] a lot of pressure from the managers. . . .  [T]o be around people would cause me too much stress."  *Id.*  He does not think he could work

a full work week without becoming angry. *Id.* In addition he finds it difficult to concentrate. *Id.*

On February 28, 2014, the ALJ entered an unfavorable decision denying Higareda's applications under both Title II and Title XVI. *Id.* at 33 (ALJ Hearing Decision). The ALJ found that Higareda met the insured status requirement, and that he was not engaged in substantial gainful activity for the period of alleged disability. *Id.* at 20. Further, the ALJ acknowledged that Higareda's bipolar mood disorder is a severe impairment, causing more than minimal limitation of work activity. *Id.* at 21. However, the ALJ determined that Higareda's impairment did not meet the criteria of Listing 12.04. *Id.* Therefore, the ALJ continued to consider whether a person with Higareda's residual functional capacity ("RFC") could perform his past work or any other work existing in significant numbers in the national economy. *Id.* at 21-32. The ALJ found that while Higareda cannot perform his past work, there is other existing work that he can perform. *Id.* Therefore, the ALJ held, Higareda is not entitled to disability benefits or supplemental social security income. *Id.* at 33.

## II.   LEGAL STANDARD

In an appeal of the denial of Social Security disability benefits, this court must review the entire administrative record to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole and may not reverse merely because substantial evidence would support a contrary outcome. *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. *Id.*

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *See Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004). We consider both evidence that detracts from and evidence that supports the Commissioner's decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If substantial evidence supports the decision, then we may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if we may have reached a different outcome. *Id.* Nevertheless, the court's review is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a rubber stamp of the Commissioner's action. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008).

### III.    DISCUSSION

At issue in this appeal is whether there was substantial evidence to support the ALJ's finding that Higareda's condition does not meet one of the Listings at 20 C.F.R. § 404, Subpart P, Appendix 1. Higareda asserts that the ALJ erred by (1) failing to follow England's expert testimony regarding the Listings and Higareda's RFC, (2) failing to give Brion's opinions controlling, or at least the greatest weight, (3) failing to make a proper credibility finding as to Higareda's testimony, (4) disregarding Ferrell's assessment, which supported Brion's opinions, and (5) according too much weight to State agency psychologists who had not met Higareda nor had the opportunity to review his complete medical records. Filing No. 11-6 at 51-55 (Representative Brief).

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled when the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy . . . either in the region in which such individual lives or in several regions of the country. 42 U.S.C. § 423(d)(2)(A). If a claimant suffers from an impairment that is included in the Listings, or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).

To determine whether or not a disability exists and meets the requirements of the Social Security Act, an ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by regulations: (1) the claimant's work history, (2) the duration and severity of the claimant's impairments, (3) whether the claimant's impairment meets or medically equals one of the Listings, (4) whether the claimant is capable of performing past work, and (5) whether the claimant is capable of performing other work that exists in substantial numbers in the economy. *See* 20 C.F.R. § 404.1520(a)(4).

### A.   Substantial Gainful Activity and Medical Severity

The ALJ first considers any work activity of the claimant. 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is involved in substantial gainful activity, he or she cannot be found disabled. *Id.* Second, the ALJ considers the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). In order for an impairment to

16

meet the requirements in this step, 20 C.F.R. § 404.1509 requires that the impairment "must have lasted or must be expected to last for a continuous period of at least 12 months," or it must be expected to result in death.  If this duration requirement is not met, the ALJ will determine that the claimant is not disabled.  *Id.*  If the duration requirement is met, the ALJ will move to step three.

In this case, the ALJ found, and this court agrees, that Higareda was not engaged in substantial gainful activity for over a year at the time of the hearing and that his bipolar disorder was medically "severe." Therefore, the court will proceed to determine whether the ALJ's determinations regarding the third, fourth, and fifth steps of the analysis were supported by substantial evidence.

### B.   Listings

At the third step in the process, the ALJ determines whether the impairment meets or equals one of the Listings.  20 C.F.R. § 404.1520(a)(4)(iii).  If the ALJ finds that this step is met, the claimant is found disabled.  *Id.*  If the impairment is found not to meet or equal one of the Listings, the ALJ moves to step four.  *Id.*  In the present case, the ALJ found that Higareda did not meet the criteria of a Listing.  Filing No. 11-2 at 21-23 (ALJ Hearing Decision).  But, for the reasons stated below, this court finds that the ALJ's determination was not supported by substantial evidence.

Listing 12.04 for Affective Disorders involves disorders that are characterized by "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  20 C.F.R. Part 404, Subpart P, Appendix 1 (2014).  The Listing may be met by either showing criteria from both § 12.04(A) and (B), or by showing criteria under § 12.04(C) alone.  *Id.* Section 12.04(A) requires that a claimant have medically

17

documented persistence of either depressive syndrome (with at least four of nine listed characteristics), manic syndrome (with at least three of eight listed characteristics, or "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)."   Under § 12.04(B), the depressive, manic, or bipolar syndrome must "[r]esult[] in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration."  *Id.*

Alternatively, § 12.04(C) may be met with a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' of inability to function outside a highly supportive living arrangement, with an indication of a continued need for such an arrangement.  *Id.*

In his analysis, the ALJ determined that Higareda did not meet Listing 12.04. Filing No. 11-2 at 21-23 (ALJ Hearing Decision).   The ALJ first determined that Higareda did not meet the criteria in 12.04(B), thus the (A) and (B) avenue of meeting Listing 12.04 was closed to Higareda.  *Id.* at 21-22.  Next, the ALJ succinctly stated, "the

evidence fails to establish the presence of the 'paragraph C' criteria of [L]isting 12.04." *Id.* at 22.  The ALJ then continued to discuss Higareda's RFC and steps four and five of the disability analysis.  *Id.* at 22-21.  For the reasons stated below, the court holds that the ALJ erred by finding Higareda did not meet the (C) criteria. Therefore, it is unnecessary for the court to review the ALJ's determination based on the (B) criteria.

Because the ALJ treated 12.04(C) in such a conclusory manner, it is difficult to ascertain precisely how he came to this determination. However, reviewing his discussion of Higareda's RFC, it is apparent that the ALJ chose to give greater weight to the opinions of State agency psychological consultants and to ALJs and the Appeals Council who had denied Higareda's previous applications.  *Id.* at 24.  The ALJ, in turn, gave little weight to the opinions of Higareda's treating medical source and the objective medical expert.  *Id.*

Under 20 C.F.R. § 404.1527(c)(2), a treating medical source's opinion such as Brion's is entitled to controlling weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Even if a treating medical source's opinion is not given controlling weight, it may still be given the greatest weight of all evidence.  SSR 96-2P, 1996 WL 374188 (Jul. 2, 1996).  If a treating medical source opinion is not entitled to controlling weight, ALJs are to accord weight to medical opinions based upon the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the extent to which the medical source supports his or her opinion, the consistency of the opinion in the record as a whole, the specialization of the medical source, and other factors (e.g., the amount

19

of understanding the medical source has of disability programs and regulations).  *See* §
404.1527(c)(2).  Opinions of non-examining sources and of objective medical experts
are subject to the same credibility factors.  *Id.* at (e)(2)(ii) and (iii).

The ALJ in the present case found that Brion's opinion was not entitled to
controlling weight because it was apparently inconsistent with the Global Assessment of
Functioning ("GAF") scores Brion assessed, with the State agency psychological
consultants' opinions, and with the previous determinations made by other ALJs and the
Appeals Council.  Filing No. 11-2 at 23-24 (ALJ Hearing Decision).  As an initial matter,
the court notes that the denials of Higareda's previous applications for benefits should
not reflect upon Higareda's present claim.  Those previous applications concerned
periods of alleged disability before Higareda's alleged onset date in the present
application and denials were not made part of this record.  The outcomes of other
administrative proceedings based upon different evidence than was presented here do
not constitute substantial evidence.

While the ALJ may have had substantial evidence to decline to give Brion's
opinion controlling weight, it was error to give it so little weight in comparison to
Schmechel's and Newman's opinions.  Brion had treated Higareda since approximately
2004, and during the relevant period, had visits every one to three months.  *See* Filing
No. 11-7 at 19 (Office Treatment Records); s*ee generally* Filing No. 11-7.  Brion treated
Higareda specifically for his bipolar disorder and related conditions, and was familiar
with his patterns of decompensation.  S*ee generally* Filing No. 11-7.  Each time that
Brion referenced Higareda's decompensation, her treatment notes recounted the
stressing event causing his decompensation, such as working on a house, providing

20

child care, travelling, or hosting a party.  *Id.* at 8, 25, 44, 48.  Finally, Brion's opinion remained consistent throughout the medical record, is supported by Ferrell's observations and notes,[1] is compatible with England's opinions, and also appears in-line with Higareda's and Higareda's wife's reports.

Schmechel and Newman, on the other hand, apparently never treated or even examined Higareda.  *See* Filing No. 11-6 at 55 (Representative Brief).  And although they are specialized experts with knowledge of disability programs and regulations, their findings are not consistent with Higareda's history of decompensation.  *See* Filing No. 11-7 at 8, 25, 33 (Office Treatment Records); *id.* at 44, 48 (Progress Notes).  These opinions should not have been given greater weight that those of Brion and England.

As for England's opinion, the court again finds that Brion's is entitled to greater weight.  The ALJ gave England's opinion some weight, choosing to adopt England's hesitation about the apparently conflicting GAF scores in Brion's treatment notes.  *See* Filing No. 11-2 at 23-24 (ALJ Hearing Decision).  The ALJ also declared that England had "opined [Higareda's] behavior disorder does not meet or medically equal a [L]isting."  *Id.* at 24.  But this misrepresents England's testimony, in which he expressed only equivocation about whether Higareda would meet the Listing on an ongoing basis, and even found support in the record for determining that Higareda met 12.04(C) based upon his episodic decompensation.  *See id.* at 57-61 (Transcript of Oral Hearing).

---

[1] The ALJ noted that Ferrell, as a nurse practitioner, is not an acceptable medical source under 20 C.F.R. § 404.1513.  Filing No. 11-2 at 27.  Ferrell is an "other source" under § 404.1513(d), and the ALJ gave her opinion little weight.  But while it is true that "[i]nformation from these 'other sources' **cannot establish the existence** of a medically determinable impairment," they "**may provide insight into the severity** of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03P, 2006 WL 2263437 (Aug. 9, 2006) (emphasis supplied).  Therefore, Ferrell's notes are still relevant to support Brion's opinions as to the severity of Higareda's impairment.

While England remained concerned about the GAF scores, he ultimately concluded there was a possibility that "under any kind of stress outside the home . . . [Higareda's] level of functioning might deteriorate from this 55 to 75 [GAF] range to a point that it would preclude work activities.  So it's possible [that Higareda meets (C)(2)]."  *Id.* at 61.  In any event, the court finds that England's equivocation and lack of familiarity with the record[2] warrants giving greater weight to Brion, who had the chance to treat Higareda over the course of several years.

Based upon a review of the entire record, the court finds that Higareda most certainly meets Listing 12.04(C)(2).  The record shows a pattern of decompensation in response to relatively minor stressors:  child care, home repair, a party, planning a trip, and crowds.  *See generally* Filing No. 11-7.  Higareda's visits with Brion generally took place after the event ceased and Higareda had taken additional medication.  Thus, it is no surprise that Higareda might have higher GAF scores during his visits after these episodes that do not reflect his limited functioning during the throes of an episode.[3]

---

[2] The record shows that England was unfamiliar with this case to the extent that he did not know what the relevant time period was.  Filing No. 11-2 at 58-59 (Transcript of Oral Hearing).  Further, England did not receive a number of medical history documents until the midst of the hearing at which he testified, and in fact never received the complete medical record in this case.  *Id.* at 46-47.

[3] The court also questions the value of GAF scores to a disability determination.  A GAF score is not determinative for Social Security purposes. *Madison v. Colvin,* 2013 WL 6504788 (W.D. Ark. December 12, 2013) at *12. The Social Security Administration has explained that "[t]he GAF scale, which is described in the DSM–III–R (and the DSM–IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorder listings." 65 Fed.Reg. 50746–765 (Aug. 21, 2000), cited in *Jones v. Astrue,* 619 F.3d 963, 973 (8th Cir. 2010) (Commissioner declined to endorse the GAF scales to evaluate Social Security claims because the scales do not have a direct correlation to the severity requirements in mental disorder Listings). The court notes that the DSM-5, the most current version of the DSM, no longer includes the GAF scale because of the scale's "conceptual lack of clarity." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (American Psychiatric Association et al. eds., 5th. ed. 2013). Thus, the ALJ erroneously relied on out-of-date information in giving little weight to Brion's and England's opinions. The court finds there is not substantial evidence on the record to support the ALJ's determination in this regard.

But the fact that Higareda functioned better at times when he was under the care of his wife and not stressed and when being taken care of by his wife, does not negate the import of his condition during his episodic decompensation. Considering the relatively minor nature of the stressors causing Higareda's repeated decompensations, and the opinions of both Brion and England, the record indicates that "even a minimal increase in mental demands or change in the environment would be predicted to cause [Higareda] to decompensate." *See* Listing 12.04(C)(2). The ALJ's determination that Higareda did not meet the (C) criteria was not supported by substantial evidence.

The court concludes that the ALJ erred by giving the opinions of England and Brion limited weight, by giving the opinions of Schmechel and Newman substantial weight, by considering the previous denials of Higareda's applications for benefits, and by finding that Higareda's condition did not meet or medically equal Listing 12.04. Therefore, it is unnecessary to review the ALJ's determination of Higareda's RFC and his ability to work in past or other jobs.

"Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992). The court finds Plaintiff has met this burden.

THEREFORE, IT IS ORDERED that:

1.      The decision of the Commissioner is reversed.

2.      Higareda's appeal is granted.

3.      This action is remanded to the Commissioner with instructions to award benefits.

23

4.     A separate Judgment will be issued in conjunction with this Memorandum and Order.

5.     Any motion for attorney fees shall be filed within 14 days of the date of this order; any objection thereto shall be filed within 14 days thereafter.

Dated this 17th day of October, 2016.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge